UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| Thomas Fuentes, | ) | Case No. 8:20-cv-190 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MB Railway Services, LLC, | ) | |
| an Indiana Corporation, and | ) | |
| Union Pacific Railroad Company, | ) | |
| a Delaware Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (FELA CLAIM)

### I.     Introduction and Procedural Background

Plaintiff Thomas Fuentes was a conductor for Defendant Union Pacific Railway (UP).  On October 4, 2018, Plaintiff was injured while riding on the side of a railcar that was struck by a fuel truck driven in reverse by Timothy Pirnie, and owned by Pirnie's employer, Defendant MB Railway Service Company (MB Railway Services).[1] The incident occurred in UP's Bailey yard in North Platte, Nebraska.[2]  MB Railway Services was a contractor operating under a contractor's agreement to provide fueling services to locomotives in the yard on behalf of UP.[3]

Plaintiff sued MB Railway Services for common-law negligence and UP for negligence under the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51-60, whose first section (45 U.S.C. § 51) renders railroads engaged in interstate commerce liable for "injury or death resulting

---

[1]  Doc. # 1 at Page ID # 3, ¶ 9.
[2]  *Id.*
[3]  *Id.* at Page ID # 2, ¶ 4.

in whole or in part from the negligence of any of the officers, agents, or employees of such carrier …." Both Defendants deny negligence and blame Plaintiff for the incident.[4]

Plaintiff moves for summary judgment against UP on the issues of negligence, causation, and comparative fault under the FELA because the undisputed facts show that Plaintiff's injuries were caused either by the negligence of MB Railway Services as UP's agent who was performing operational activities for UP – or –James Richter, UP's employee and Plaintiff's trainer.[5] Resolving which of the two were negligent or their respective percentage of fault is irrelevant to the motion since UP is vicariously liable for the conduct of its agent, MB Railway Services, and its employee, Richter. The evidence establishing UP's fault includes MB Railway Services driver violating UP's rules and procedures setting out specific steps that must be taken when operating a vehicle in reverse. There is no dispute that Pirnie violated UP's rules and procedures. In fact, within minutes of the incident, Pirnie was banned from UP's yard, and he was then fired by MB Railway Services.

Also, UP's fault is established when Richter who was training Plaintiff in Remote Control Operations (RCO) to control the movement of locomotives by using a Remote-Control Locomotive (RCL) box failed to provide him with proper instructions and orders. Specifically, as part of his training as a RCO, Plaintiff rode the side of the lead railcar (the point) being pushed by a locomotive and controlled by using a RCL box worn over the Plaintiff's neck. As Plaintiff and Richer (trainer) made the move, Richter was riding on the opposite side of the same railcar as Plaintiff. Richter's task was to assure that Plaintiff's actions complied with all applicable rules.

---

[4] UP Answer at Doc # 8 at Page ID # 25, ¶ 10, Page ID # 26, ¶ 17; MB Railway Services Answer, Doc # 7 at Page ID # 21, ¶ 12, ¶ 2.
[5] Plaintiff's motion is for partial summary judgment, which leaves the issues of the extent of Plaintiff's injuries caused in the October 4, 2018 incident and the resulting damages for the jury to determine with respect to his FELA claim.

When Plaintiff saw the approaching fuel truck, driven by Pirnie, Plaintiff asked Richter what to do, and instead of instructing him to stop the train movement immediately, he told him to sound the locomotive's bell and horn. While Plaintiff looked at the RCL box to comply with Richter's instructions, he heard an expletive (most likely from Richter), he looked up, and was struck by the fuel trucks side mirror, which resulted in Plaintiff being thrown from the car and onto the ground.

With respect to the issue of comparative fault, summary judgment is appropriate because the undisputed evidence shows that Plaintiff operated the movement under the direction of his trainer, Richter who was required to order Plaintiff to stop if the fuel truck fouled the track on which they were operating. The undisputed evidence further shows that Richter never ordered Plaintiff to stop prior to impact. To create a jury question concerning comparative fault, UP must offer evidence that Plaintiff added an additional danger. But there is no such evidence since he was under the direct control of Richter, and Plaintiff had no discretion but to follow his orders.

## II.      Statement of Undisputed Facts

Plaintiff submits the following statement of undisputed facts as required by NECivR 56.1(a):

### A.      Background facts.

1.      Plaintiff was hired by UP to work as a conductor, and his first day of training for the job was on July 9, 2018. Ex. 2 at 21:8-11, 21:18-19.

2.      Prior to the October 4, 2018 incident, Plaintiff had operated a locomotive by using a RCL box two or three times. Ex. 2 at 53:13-16.

3.      Plaintiff's RCO training included being taken to the Bailey yard west run-through yard to pair or set up the communication between the locomotive and the RCL box. The training

also included operating the RCL box to move the locomotive forward and backwards, to conduct brake and "man down" tests, and to stop the locomotive. Ex. 2 at 80:4-18.

4.    There was no in-class instruction on using a RCL box because the class-room simulators did not work. Ex. 2 at 56:23-57:6.

**B.    October 4, 2018 incident.**

5.    On October 4, 2018 at 3:00 p.m., Plaintiff reported to the breakroom at UP's Bailey yard to meet with two trainers, James Richter (nickname "Rocket") and Cody Strawder, and they were assigned "to do some switching maneuvers in ... [t]he west run-through" yard. Ex. 2 at 72:19-24.

6.    While talking to Richter and Strawder, Plaintiff asked them about switching maneuvers they were going to make during the shift, and they provided him with "a big picture explanation as to what you were doing, and that the detailed explanations would come at your meetings [job briefing] with the yardmaster and then once you got to the yard." Ex. 2 at 75:9-21, 76:6-11.

7.    Plaintiff, Richter and Strawder went to the yardmaster's office for a job briefing and to retrieve "a train list." Ex. 2 at 74:10-12.

8.    Plaintiff had never worked in the specific part of the yard before the day in question, and he had never seen a train list before. It was explained to him what the numbers meant on the list, what switching maneuvers the crew were going to make that day, and the sequence of the switching maneuvers. Ex. 2 at 74:13-19.

9.    Plaintiff does not recall any specifics about the discussions that took place during the job briefing in the yardmaster's office. There was jargon used during the discussion that Plaintiff did not understand. He asked for an explanation related to the jargon and "was told it

would make more sense when we got out there. They would explain it further." Ex. 2 at 80:19-81:4.

10.　　The crew was assigned the use of a single locomotive to perform the switching, and the locomotive had what Plaintiff believes were two cars attached to it that they were going to take to "a train that was waiting." Ex. 2 at 82:7-9, 82:16-83:1

11.　　Once at the locomotive, the crew paired the RCL box with the locomotive, and they "did the various man down test, we did the air brake test. All the various checks that you do when you pair up the box." Ex. 2 at 83:5-11.

12.　　The crew had two RCL boxes, with Strawder paired with one and Plaintiff paired with the other. Ex. 2 at 83:17-21.

13.　　The RCL box paired with Strawder controlled the locomotive's west-bound movement and the box paired with Plaintiff controlled the east-bound movement, "which was the majority of the work." Ex. 2 at 83:22-84:4.

14.　　After completing the safety checks, the crew gathered on the south side of the locomotive and car, and had a job briefing where they discussed the exact switch maneuver that was going to be performed. Ex. 2 at 83:12-16.

15.　　In the job briefing, it was explained of Plaintiff that Strawder had control the of west-bound movement, and he would control the movement while the locomotive and cars went past a switch. The person who transported the crew to the work site who was located at the switch would throw the switch once the locomotive and cars had cleared it, and he would line the switch onto the track. Once this was done, Plaintiff would take control of the movement, and would control the locomotive and cars down the track as they traveled east. Ex. 2 at 85:2-22.

16.     The locomotive and cars were located on a track in the 2070s and the train which the cars were to be connected was a distance far enough that the crew determined "walking wasn't going to be an option … that we were going to ride the car to the train … it was agreed upon between the three of use, and [Plaintiff] went with it." Ex. 2 at 85:23-86:5.

17.     While Strawder controlled the west-bound movement, the train crew rode in the locomotive cab, which was the point (front of the movement with trailing cars), which is allowed under the rules. Ex. 2 at 86:15-23, 87:8-12.

18.     At some point, the locomotive stopped, and Plaintiff and Richter got off while Strawder remained on the locomotive. Ex. 2 at 86:24-87:1, 89:3-13.

19.     As the locomotive and cars moved east towards the switch, Plaintiff believes that Richter and he "were on the ground on the south side of the track." Ex. 2 at 89:17-20.

20.     Throughout this time, Plaintiff remained in radio contact with the two other crew members, and after the locomotive and cars passed the switch, Strawder told Plaintiff he was "throwing control" to him so he could operate movement using the RCL box. Ex. 2 at 88:4-8.

21.     Throughout the time while Plaintiff was in the area of the switch waiting for it to be thrown and as the locomotive and cars moved past the switch, he did not see any refueling trucks nor did he know there were refueling trucks in the area. Ex. 90:5-20.

22.     Plaintiff was asked at his deposition, "[w]hen was the first time you noted the refueling truck," and he answered:

> So, like I said, the train pulls past us, [Richter] get on the ladder of the car on the north side of the car, and I was on the south side of the car, so basically we're facing each other. Okay.
>
> And … he's coaching me. "Go up … to the first hole." And these are speeds, by the way. "Go up to the first hole." I did that. He goes, "go ahead, go up to the second hole" because you work the speeds in stages. He said "go ahead, go the third hole," so I went to the third hole.

And I said, "hey, man, what about that truck?" And he said "go ahead and sound your horn and bell." And I looked down to sound my horn and bell, and I hear, "oh s...."

And as soon as I looked up, [Pirnie, the] driver was coming back. And at that point ... I was trying to throw the train into emergency. I was trying to get as close to the car as I could before he hit me. And he hit me, and I hit the ground.

Ex. 2 at 90:24-91:20.

23. Plaintiff is not sure who said the expletive, but he assumed it was Ritcher since he was in the immediate area. Ex. 2 at 95:6-10.

24. When Plaintiff heard the expletive, Plaintiff "looked up, the driver was coming back on top of me. When [Plaintiff] looked up, [he] was just trying to throw the thing in emergency and get out of the way. At that point all ... [his] efforts were trying to get out of the way." Ex. 2 at 95:16-22.

25. Plaintiff believes he was able to apply the emergency brakes because the RCL box's controls indicated the application (i.e., "[t]he paddle was all the day down"). Ex. 2 at 102:16-22.

26. The truck's mirror struck Plaintiff's leg and he was knocked to the ground. Ex. 2 at 100:16-90.

27. While at the scene, Plaintiff heard the truck driver say he did not see him. Ex. 2 at 102:8-10.

28. As a result of the October 4, 2018 incident, UP does not dispute the Plaintiff suffered an injury as set out in its response to Plaintiff's requests for admissions:

17. Admit that the medical treatment Thomas Fuentes received in the emergency room on October 4, 2018, at Great Plains Regional Medical Center in North Platte was reasonably necessary and causally related to work-related injury of October 4, 2018.

**RESPONSE: Admit.**

18. Admit that the medical transportation provided to Thomas Fuentes from North Platte to Denver by air ambulance was reasonably necessary and causally related to the work-related injury of October 4, 2018.

**RESPONSE: Admit.**

19. Admit that the medical treatment Thomas Fuentes received at Denver Health was reasonably necessary and causally related to the work-related injury of October 4, 2018.

**RESPONSE: Admit.**

20. Admit that the medical treatment and rehabilitation Thomas Fuentes received at Briarwoods Health Care Center was reasonably necessary and causally related to the work-related injury of October 4, 2018.

**RESPONSE: Admit.**

21. Admit that the medical treatment Thomas Fuentes received from Dr. Steven Sands was reasonably necessary and causally related to the work-related injury of October 4, 2018.

**RESPONSE: Admit.**

22. Admit that the surgeries performed on Thomas Fuentes on October 5, 2018, October 29, 2018, February 6, 2019, and October 2, 2019, were reasonably necessary and causally related to the work-related injury of October 4, 2018.

**RESPONSE: Admit.**

Ex. 3 at 1-2.

C.    **Timothy Pirnie's conduct on October 4, 2018.**

29. On October 4, 2018, Timothy Pirnie was employed by MB Railway Services to drive fuel trucks and fuel trains at UP's Bailey yards. Ex. 4 at 9:5-13, 10:9-12.

30. At the time Pirnie struck Plaintiff, he operated the truck in reverse or a back-up movement. Ex. 4 at 20:23-7.

31. Before backing up, Pirnie never got out of the truck to observe the surrounding area. Ex. 4 at 21:17-20.

32.     There were no other persons in the truck cab when Pirnie backed up the truck.  Ex. 4 at 21:8-10.

33.     Before backing up, Pirnie saw the train occupied by Plaintiff as he pulled the truck forward.  Ex. 4 at 21:24-22:1

34.     As he pulled the truck forward, Pirnie stopped the truck, checked the truck's mirrors and back-up camera, and then proceeded backwards.  Ex. 4 at 22:2-5.

35.     Pirnie saw the train in question by using the truck's mirrors and back-up camera, but he did not believe the train was moving.  Ex. 4 at 22:6-19.

36.     A post-incident investigation by MB Railway Services' employee Stan Marchlewski, included questioning Pirnie where he stated he did not see the train moving.  Ex. 5 at 14:5-16.

**D.     UP's rules governing conduct of MB Railway Services' employees while working at its yard.**

37.     In response to Plaintiff's Rule 30(b)(6) deposition notice, UP produced Brian Jarrett, to provide testimony related to the rules and procedures UP's contractors are governed by.  Ex. 6 at 6:3-14; Ex. 7.

38.     With respect to contractors performing work for UP at its yards, MB Railway Services and its employees were governed by UP's rules.  Ex. 6 at 14:10-16.

39.     UP's governing rules included "a set of minimum safety standards that [UP] expect on [its] property, and then the contractor has to meet those standards."  Ex. 6 at 15:21-24.

40.     UP's training materials provided to contractors included a "Safety Certification Study Guide," which was put together by UP's engineering department for contractors and contains UP's rules.  Ex. 6 at 19:13-23; Ex. 8.

41.     With respect to Jarrett's discussion of Rules 1.1 and 1.1.1, he agreed that they required contractor's employees to take the safe course if they have any doubt or uncertainty. Ex. 6 at 21:9-17; Ex. 8 at 4.

42.     With respect to Rule 1.1.2, Jarrett agreed that contractors such as MB Railway Services' employees were required to be alert and attentive when performing their work in order to avoid injury. Ex. 6 at 21:18-22:4; Ex. 8 at 4.

43.     With respect to Rule 4.1 titled "Safety Responsibilities", Jarret agreed that the rule provides that contractor employees must take every precaution to prevent injury to themselves and other contractor employees and the public, and contractor employees comply with all UP's guidelines and procedures. Ex. 6 at 21:5-17; Ex. 8 at 16.

44.     With respect to Rule 6.2.2 titled "Driver Responsibility", Jarrett agreed that the rule sets out the responsibilities of contractor employees while driving on UP property. Rule requires drivers to use courtesy, consideration, and common sense to prevent accident, and to control situations encountered that cannot be provided for in the law. Ex. 6 at 22:18-23:12, Ex. 8 at 26.

45.     With respect to Rule 6.7 titled "Back-Up Moves", Jarrett agreed the contractor employees were required to comply with the following:

| **6.7:**<br><br>**Back-up Moves** | Work must be planned to minimize back-up moves and to avoid driving into areas requiring back-up moves. No back-up move is allowed when a forward move can safely be made.<br>Contractor employee(s) in the cab of a vehicle must not distract the driver with unnecessary conversation or other distractions until the back-up move is completed. |
|---|---|
| **6.7:**<br><br>**Back-Up Moves continued** | Before initiating a back-up move, the driver must:<br>1. Walk around the vehicle and confirm that it is safe to move unless a second person is directing the move as described in (A).<br>2. Sound horn if back up alarm is inoperative or unavailable.<br><br>When safe to do so, proceed not exceeding 5 MPH and complying with either (A) or (B) below. |

(A) When a second person is available to direct the back-up move (i.e. any other employees or contractors in the vehicle or present at the work location):
• A job briefing must be performed prior to movement, addressing the direction of move and position of person protecting the move.
• The person directing the movement, when safe to do so, must be near the rear of the vehicle.
• Driver must immediately stop if the person who is directing the movement disappears from the driver's view.

(B) When a second person is not available:
• The driver must stop every 150 feet, secure the vehicle and visually confirm that nothing has entered the path of the rearward movement of vehicle.
• This will be repeated consecutively every 150 feet or until back-up move is no longer required.

Ex. 6 at 24:8-25:1; Ex. 8 at 27-28.

46.     Jarrett also discussed the requirements contained in UP's publication titled "Contractor Minimum Safety Requirements" that contained "Rule 3.4 Back-Up Moves" that mimicked Rule 6.7. Ex. 6 at 26:3-27; Ex. 9 at 9-10.

47.     Jarrett agreed that UP's rules related to back-up moves required that before any such move may be performed, the driver must walk to the rear of the vehicle to confirm that it is safe to move, unless a second person is present to direct to back-up move. Ex. 6 at 26:3-21.

48.     The reason for UP's rules concerning back-up moves was "to help protect the safety of both UP employees and contractors that work for [UP]." Ex. 6 at 29:11-30:4.

**E.      As a result of Pirnie hitting Plaintiff while backing up the fuel truck, he was banned from UP's property and fired by MB Railway Servies.**

49.     Stan Marchlewski, MB Railway Services' employee whose title at the time was operations manager for North Platte, investigated the incident the day it occurred. Ex. 5 at 8:15-18.

50.     Within ten minutes of Marchlewski arriving on the scene to conduct the investigation, he was notified that Pirnie was banned from UP's yard, which then resulted in MB Railway Services firing him.  Ex. 5 at 35:13-25.

51.     The following exchange took place between Plaintiff's counsel and Marchlewski at his discovery deposition on the subject why Pirnie was banned that resulted in his firing:

Q.     Do you know why?

A.     Any time you come in contact with Union Pacific equipment or personnel, you're immediately banned from the property.

Q.     MB Railway Services at that time expected their drivers to operate their fuel trucks in a way that didn't crash into people or trains; correct?

A.     That is correct.

Q.     And Mr. Pirnie failed to avoid crashing into a Union Pacific employee on this date, true?

A.     True.

Q.     And as a consequence of that, you're telling us the Union Pacific, within ten minutes following this incident, indicated he would no longer be permitted to work on Union Pacific property; is that right?

A.     That is correct.

Q.      Then what did that leave MB Railway Services to do regarding Mr. Pirnie's employment with MB Railway Services?

[BNSF's counsel]: Form.

[MB Railway Services' counsel]: Join the objection.

THE WITNESS: He was terminated.

BY [Plaintiff's counsel]:

Q.     Did you agree with that determination?

[MB Railway Services' counsel]: Objection, form and foundation.

THE WITNESS: Yes, sir, I did.

BY [Plaintiff's counsel]:

Q.      And why is that?

A.      If he was not going to follow proper protocol, he was not going to work for me.

Q.      And what specifically is the proper protocol that you expect him to follow that he did not follow?

A.      I expected him to observe all the surroundings at all times.

* * *

Q.      Would it be fair to summarize it this way, that Mr. Pirnie's termination from MB Railway Services was based on the fact he didn't follow the rules that he was required to follow?

[MB Railway Services' counsel]: Object to form and misstates his prior testimony. Go ahead, Stan.

THE WITNESS: Yes.

Ex. 5 at 36:1-37:12, 37:24-38:5.

F.      **James Richter's failure to properly direct Plaintiff to stop during the switch movement contributed to the collision.**

52.      UP designated Jerry Ochoa as an expert witness to provide testimony. Ex. 10 at.

5:14-23. At his discovery deposition, Ochoa was asked about Richter's conduct on October 4,

2018 when he was training Plaintiff as set out in paragraphs 53 through 59.

53.      At the time in question, Richter was Plaintiff's trainer, and he rode on the north side

of the railcar, which was on the opposite side of the same car ridden by Plaintiff. Ex. 10 at 39:8-

20.

54.      Richter was "in close proximity [to plaintiff] to take immediate [corrective] action."

Ex. 10 at 40:4-10.

55.     As the trainer riding the point, Richter had the responsibility to observe the track ahead to determine whether there were any pieces of equipment or vehicles fouling the track, which was part of his obligation to maintain a safe course. Ex.10 at 40:11-18.

56.     As the trainer, Richter was obligated to tell Plaintiff to stop if he observed him doing something improper or in violation of UP's safety rules. Ex. 10 at 41:14-19.

57.     As Richter rode the point, he was obligated to maintain a safe course, to be alert and attentive. Ex. 10 at 41:11-13, 43:5-7.

58.     During the switch maneuver, Richter's obligation as Plaintiff's trainer included making sure the movement of the train was in compliance with UP's rules. Ex. 10 at 47:6-11.

59.     If Richer saw the truck backing up and fouling the track, Richter "could have advise[d] Mr. Fuentes" to stop the movement, which was a requirement under the rules for maintaining a safe course. Ex. 10 at 49:16-24.

60.     UP retained Noel Manual as an expert witness. Ex. 11 at 8:17-19. At his discovery deposition, Manuel discussed his opinions concerning the stopping distances had the movement of the locomotive and cars stopped at various points as set out in paragraphs 61 through 65.

61.     Manual's report includes a calculation that Plaintiff (who is riding the side of the car) would have been 316 feet from impact at the time MB Railway Services' truck began its forward movement. Based on this figure, if Plaintiff had applied the locomotive's brakes at this movement, the train would have stopped in 28 feet or about 288 feet from impact. Ex. 11 at 33:23-34:12.

62.     Manual's report includes a calculation that Plaintiff would have been 120 feet from impact at the time MB Railway Services' truck stopped. Based on this figure, if Plaintiff had

applied the locomotive's brakes at this moment, the train would have stopped in about 91 feet or about 29 from impact. Ex. 11 at 34:20-35:6.

63.     Manual's report includes a calculation that Plaintiff would have been 107 feet from impact at the time MB Railway Services' truck engaged its reverse lights indicating the truck was in reverse. Based on this figure, if Plaintiff had applied the locomotive's brakes at this moment, the train would have stopped in 81 feet or about 26 feet from impact. Ex. 11 at 35:14-35:22.

64.     In all the material UP provided to Manual to review when reaching his opinions, there was no indication that Richter told Plaintiff to stop the train when the truck moved forward, when the truck stopped or when the truck was put into reverse. Ex. 11 at 34:14-19, 35:8-13, 35:23-36:3.

65.     In all the material UP provided to Manual to review when reaching his opinions, there was no indication that Richter told Plaintiff to place the train into emergency. Ex. 11 at 36:3-8.

**G.     MB Railway Services providing operational activities for UP.**

66.     Plaintiff served requests for admissions on UP and UP responded as follows:

5.     Admit that MB Railway Services was a company contracted by Union Pacific to provide fueling of locomotives in the North Platte yard.

**RESPONSE: Union Pacific objects to this request as it is not reasonably calculated to lead to the discovery of relevant and/or admissible evidence in that neither MB Railway Services, nor Mr. Pirnie, were performing locomotive fueling services at the time the incident occurred. Notwithstanding said objection and specifically reserving said objection, admit.**

6.     Admit that the locomotives operating in the North Platte yard require diesel fuel to operate.

**RESPONSE: Union Pacific objects to this request as it is not reasonably calculated to lead to the discovery of relevant and/or admissible evidence in that neither MB Railway Services, nor Mr. Pirnie, were performing locomotive fueling services at the**

time the incident occurred. **Notwithstanding said objection and specifically reserving said objection, admit.**

7.     Admit that locomotives are serviced by Union Pacific at a service track which can include fueling of locomotives.

**RESPONSE: Union Pacific objects to this request as it is not reasonably calculated to lead to the discovery of relevant and/or admissible evidence in that neither MB Railway Services, nor Mr. Pirnie, were performing locomotive fueling services at the time the incident occurred. Notwithstanding said objection and specifically reserving said objection, admit.**

8.     Admit that fueling of locomotives at service tracks are performed by railroad employees who are represented by the union of the National Conference of Fireman and Oilers.

**RESPONSE: Union Pacific objects to this request as it is not reasonably calculated to lead to the discovery of relevant and/or admissible evidence in that neither MB Railway Services, nor Mr. Pirnie, were performing locomotive fueling services at the time the incident occurred. Notwithstanding said objection and specifically reserving said objection, admit.**

9.     Admit that the fueling of locomotives is a necessary activity to continue railroad operations.

**RESPONSE: Union Pacific objects to this request as it is not reasonably calculated to lead to the discovery of relevant and/or admissible evidence in that neither MB Railway Services, nor Mr. Pirnie, were performing locomotive fueling services at the time the incident occurred. Notwithstanding said objection and specifically reserving said objection, admit.**

10.     Admit that the demand for fueling some locomotives in the North Platte yard was provided by MB Railway Services under contract from Union Pacific.

**RESPONSE: Union Pacific objects to this request as it is not reasonably calculated to lead to the discovery of relevant and/or admissible evidence in that neither MB Railway Services, nor Mr. Pirnie were performing locomotive fueling services at the time the incident occurred. Notwithstanding said objection and specifically reserving said objection, admit.**

Ex. 12 at 3-4.

### III.    Summary Judgment Standard

Plaintiff's summary judgment motion involves his FELA claim against UP, asking the

Court to find as a matter of law:

1       UP was negligent based on the conduct of its agent's employee, Timothy Pirnie,
        and/or its own employee, James Ritcher;

2.      UP's negligence caused in whole or in part the October 4, 2018 incident and injury;
        and

3.      Plaintiff was not contributorily negligent.

This Court has previously outlined the summary judgment standards:

Under Rule 56(a), summary judgment is required if the movant shows that there is
no genuine dispute as to any material fact and the movant is entitled to judgment as
a matter of law.  A party cannot defeat a summary judgment motion by asserting
the mere existence of some alleged factual dispute between the parties; the party
must assert that there is a genuine issue of material fact.

The Court views the facts in the light most favorable to the nonmoving party only
if there is a genuine dispute as to those facts.  To show a genuine dispute of material
fact, a party must prove more than conjecture and speculation.  They have an
affirmative burden to designate specific facts creating a triable controversy.

Only disputes over facts that might affect the outcome of the suit under the
governing law will properly preclude the entry of summary judgment.  If the record
taken as a whole could not lead a rational trier of fact to find for the nonmoving
party, summary judgment should be granted.

*United States v. Hidy*, 471 F.Supp.3d 927, 931 (D. Neb. 2020) (internal citations and quotation

marks omitted).

The undisputed facts compel the conclusion that summary judgment must be entered

against UP.  If UP claims that Plaintiff's conduct as a trainee was negligent, then it is vicariously

liable for the inaction of its trainer-employee, James Richter, when he failed to order Plaintiff to

stop when Plaintiff asked him what to do about the truck.  On the other hand, if UP claims that

Plaintiff and Richter were not negligent, then the sole responsibility rests with UP's agent, MB Railway Services, who was conducting operational activities for UP. MB Railway Services' employee, Timothy Pirnie, failed to keep a proper lookout and abide by UP's rules when he backed up the fuel truck, struck Plaintiff and knocked him to the ground.

Additionally, the undisputed evidence establishes that UP's negligence caused the October 4, 2018 incident and resulted in injury to Plaintiff.

Finally, UP cannot establish a jury issue on the issue of comparative fault since such a defense depends on showing that Plaintiff added any additional danger since he complied with Richter's direction to first sound the horn and whistle and was struck while he was completing the task assigned by a superior employee, Richter.

### IV. Argument

**A.     FELA negligence standards.**

**1.     UP is liable for the negligent acts of its employees and agents.**

Section 1 of the FELA makes a railroad liable "for such injury ... resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier ...." 45 U.S.C. § 51. There is no dispute that James Richter was UP's employee at the time he trained Plaintiff on October 4, 2018.

With respect to who is a railroad's agent under the FELA, the test is whether the person is conducting operational activities for the railroad. *Sinkler v. Missouri Pacific R.R. Co.*, 356 U.S. 326, 331-32 (1958). To put the test into context, an understanding of the facts in the case is helpful. The facts of the case involved the plaintiff, a cook working on a private car owned by his employer railroad, being injured when a train crew employed by a second railroad switched the car occupied

by the plaintiff into a second car causing a violent collision. *Id.* at 327. The plaintiff's employer contracted with a second railroad to perform switching. *Id.*

The U.S. Supreme Court held that the second railroad's employees who caused the violent collision were acting as agent of plaintiff's employer since they were "engaged in furthering the operational activities" of the employer. *Id.* at 331. In reaching its holding, the court did not rely on common-law principles but instead the broad application the FELA must be given:

> [W]hile the common law had generally regarded the torts of fellow servants as separate and distinct from the torts of the employer, holding that latter responsible only for his own torts, it was the conception of this legislation that the railroad was a unitary enterprise, its economic resources obligated to bear the burden of all injuries befalling those engaged in the enterprise arising out of the fault of any other member engaged in the common endeavor. Hence a railroad worker may recover from his employer for an injury caused in whole or in part by a fellow worker, not because the employer is himself to blame, *but because justice demands that one who gives his labor to the furtherance of the enterprise should be assured that all combining their exertions with him in the common pursuit will conduct themselves in all respects with sufficient care that his safety while doing his part will not be endangered.* If this standard is not met and injury results, the worker is compensated in damages.

*Id.* at 330 (emphasis added).

The *Sinkler* test defining an agent as an entity performing operational activities of an employer railroad has been applied to a wide range of activities. *See, e.g., Lockard v. Missouri Pac. R.R. Co.*, 894 F.2d 299, 303 (8th Cir. 1990) (holding boarding house providing lodging to railroad employees was employer railroad's agent); *Carter v. Union R.R. Co.* 438 F.2d 208, 211 (3rd Cir. 1971) (holding owner of a parking lot who provided parking to railroad employees was employer railroad's agent); *Leek v. Baltimore & Ohio R.R. Co.*, 200 F.Supp. 368, 371 (N.D. W. Va. 1962) (holding Yellow Cab transporting railroad employees was employer railroad's agent); *Horne v. Illinois Cent. R.R. Co.*, 2018 WL 2287122, * 2 (E.D. La. May 17, 2018) (holding

company operating "trackhoe" was employer railroad's agent); *Dykes v. BNSF Ry. Co.*, 356 F.Supp.3d 1097, 1103-04 (W.D. Wash. 2018) (holding company that owned track on which railroad employee had to operate train was employer railroad's agent); *Moore v. Chesapeake & Ohio Ry. Co.*, 493 F.Supp. 1252, 1259-60 (S.D. W. Va. 1980) (holding company providing catering services at employer railroad's facility was its agent), *aff'd*, 649 F.2d 1004 (4th Cir. 1981).

The evidence establishes that MB Railway Services was UP's agent on October 4, 2018 under the operational activities test as established by UP's responses to Plaintiff's requests for admissions. Plaintiff's requests asked UP to admit: (1) "that MB Railway Services was a company contracted by Union Pacific to provide fueling of locomotives in the North Platte yard," (2) "that the locomotives operating in the North Platte yard require diesel fuel to operate," (3) "that locomotives are serviced by Union Pacific at a service track which can include fueling of locomotives," (4) "that fueling of locomotives at service tracks are performed by railroad employees who are represented by the union of the National Conference of Fireman and Oilers," (5) "that fueling of locomotives is a necessary activity to continue railroad operations," and (6) "that the demand for fueling some locomotives in the North Platte yard was provided by MB Railway Services under contract from Union Pacific." Ex. 12 at 3-4. After boiler-plate objections, UP admitted the factual propositions. *Id.* So just like the train crew employed by a third-party acting as the employer railroad's agent in *Sinkler*, MB Railway Service was acting as UP's agent based on UP's admissions that it had a contract with a third party that provided the fundamental services of fueling locomotives at its North Plate yards, and without these services, its locomotives could not operate.

## 2. UP's employee, agent or both were negligent as a matter of law.

One of the cornerstones of the FELA is the rule that a railroad has a non-delegable duty to provide its employees with a reasonably safe place to work. *Bailey v. Cent. Vermont Ry.*, 319 U.S. 350, 352 (1943) (citation omitted). The FELA statutorily imposes a higher standard of care that is in addition to the more general duty of care which the law requires of all persons under common-law negligence. *See Kernan v. American Dredging Co.*, 355 U.S. 426, 439 (1958) (noting "the theory of the FELA is that where the employer's conduct falls short of the high standard required of him by this Act, and his fault, in whole or in part, causes injury, liability ensues"); *see also Ackley v. Chicago & N. W. Transp. Co.*, 820 F.2d 263, 266 n. 5 (8th Cir. 1987) (noting duties under the FELA "are well beyond those imposed under the common law of master and servant").

From the general duty of providing a safe place to work, the law has developed and recognized broad duties including, the duty to promulgate and enforce safety rules, *Ybarra v. Burlington N., Inc.*, 689 F.2d 147, 150 (8th Cir. 1982); and the duty to instruct, *Phillips v. Chesapeake & Ohio Ry. Co.*, 475 F.2d 22, 24 (4th Cir. 1973). Implicit in the duty to enforce safety rules is the duty a defendant's employees and agents to follow safety rules. *See Bracy v. Great N. Ry. Co.*, 136 Mont. 65, 67, 69, 343 P.2d 848, 849-50 (1959) (agreeing that jury was correctly instructed that the plaintiff may assume defendant's employee will obey company rules while conducting switching operations).

The duties to follow safety rules and instruction are central to Plaintiff's negligence claims as they relate to Pirnie's conduct where he violated UP's rules, including the back-up rule, and Richter's conduct where he violated UP's rules, including keeping a proper lookout when he rode on the side of the car and directing Plaintiff in his RCO training (i.e., telling him to sound the whistle and horn when asked about the truck rather than telling Plaintiff to stop the movement).

Evidence showing a railroad's failure to follow its own rules has time and again been the basis for establishing a breach of duty under the FELA. *See, e.g., Fulton v. St. Louis-San Francisco Ry. Co.*, 675 F.2d 1130, 1122 (10th Cir. 1982) (agreeing that railroad's rules were admissible "as evidence of the measure of caution which are to be exercised in situations in which the rules apply"); *Kurn v. Stanfield*, 111 F.2d 469, 473 (8th Cir. 1940) (noting evidence of the railroad's failure to follow its own internal rules supported the jury's finding of negligence, and also an employee may rely upon its employer's internal rules for the standards of conduct they may anticipate); *Renaldi v. New York, New Haven & Hartford R.R. Co.*, 230 F.2d 841, 844 (2nd Cir. 1956) (noting the railroad's failure to follow its own safety rule established its negligence since the rule was enacted for the protection of the plaintiff, and where violation contributed to occurrence of the accident); *Wilson v. Norfolk & W. Ry. Co.*, 109 Ill.App.3d 79, 91, 440 N.E.2d 238, 248 (1982) (noting the railroad's failure to follow its own rules is evidence of its negligence); *Chesapeake & Ohio Ry. Co. v. Biliter*, 413 S.W.2d 894, 897 (Ky. Ct. App. 1967) (noting evidence that railroad failed to follow its own rules with respect to inspecting tracks "warranted a finding of negligence of the railroad"); *Jacobson v. Chicago & N. W. Ry. Co.*, 221 Minn. 454, 457, 22 N.W.2d 455, 458 (1946) (noting "[s]ecific directions made part of rules constitute standards of care, presumably demanded by the exigencies of the business, to which all persons employed in the business are required to conform").

The undisputed evidence establishes that either Pirnie and/or Richter were negligent on October 4, 2018. UP required Pirnie to follow its safety rules that were specific to backing up vehicles that included getting out of the vehicle before the move is made to "confirm that it is safe to move." Ex. 6 at 24:8-25:1; Ex. 8 at 27-28. Because there was no second person with Pirnie, he

was required to "stop every 150 feet, secure the vehicle and visually confirm that nothing has entered the path of the rearward movement of vehicle." Ex. 8 at 27-28.

Pirnie saw the train on which Plaintiff was riding through the truck's mirrors and back-up camera when he moved the truck forward. Ex. 4 at 21:24-22:5. But the undisputed evidence establishes that Pirnie never got out of the truck before the back-up move to "confirm that it [was] safe to move." *Id.* at 21:17-20. Just as important, Pirnie also failed to confirm it was safe to perform the back-up move based on him not seeing the train movement as he testified at his discovery deposition. *Id.* at 22:6-19. Pirnie's deposition testimony is corroborated by the statement he made to MB Railway Services' investigative employee, Stan Marchlewski, who he told he did not see the train moving. Ex. 5 at 14:5-16. Plaintiff also heard Pirnie state shortly after the incident that he did not see Plaintiff. Ex. 2 at 12:8-10. UP found Pirnie's conduct rose to the level of banning him from the North Plate Yard shortly after the incident occurred, and MB Railway Services concurred with UP's banning when it fired him. Ex. 5 at 35:13-25. Indeed, MB Railway Services' employee assigned to investigate the incident testified at his discovery deposition that he agreed with the firing due to Pirnie's failure to "follow proper protocol." *Id.* at 36:1-37:12, 37:24-38:5. This evidence overwhelmingly establishes UP's negligence when its agent's employee violated rules requiring specific conduct when backing up the fuel truck.

Turning to the negligent acts of Richter, Plaintiff's trainer, the undisputed evidence establishes that Plaintiff was relatively inexperienced with respect to controlling train movement with a RCL box. Prior to October 4, 2018, Plaintiff had operated a locomotive by using a RCL box only two or three times. Ex. 2 at 53:13-16. Plaintiff had never worked in the specific yard where the switching was to be performed. *Id.* at 74:13-14. Although UP's two employees who were assigned to train Plaintiff, Richter and Strawder, gave Plaintiff a "big picture explanation"

concerning the switching to be performed, they told Plaintiff a more detailed explanation would be given at the meeting with the yardmaster and once they were performing the job. *Id.* at 75:9-21, 76:6-11.

At the yardmaster's office Plaintiff received a train list, which he was unfamiliar with, and the switch movements were discussed with some of the discussion using jargon that Plaintiff did not understand. Ex. 2 at 74:10-12, 80:19-81:4. Plaintiff asked for clarification about the jargon used by the other, and he "was told it would make more sense when we got out there. They would explain it further." Ex. 2 at 80:19-81:4.

Once the crew was in the yard and ready to move the locomotive and two cars, Plaintiff was positioned on one side of the lead railcar with Richter positioned on the other side. Ex. 2 at 90:24-91:2. Richter, as Plaintiff's trainer and riding the point of the movement, was positioned in close proximity to Plaintiff so he could "take immediate action" if needed. Ex. 10 at 40:4-10. As Plaintiff's trainer, Ritcher's responsibilities included: (1) watching for equipment of objects fouling the track; and (2) stopping Plaintiff if he observed him doing something improper or in violation of UP's rules. Ex. 10 at 40:11-18, 41:14-19, 43:5-7, 44:19-22.

The evidence establishes that Richter failed to comply with UP's rules and his instruction of Plaintiff when he failed to tell Plaintiff to stop when Plaintiff asked him "what about the truck," and instead told him "go ahead and sound your horn and bell." Ex. 2 at 91:11-13. Plaintiff followed Richter's instructions where he looked down at the RCL box to sound the horn and bell, and he then heard an expletive, most likely from Richter, looked up and saw the truck backing up. *Id.* at 91:13-16, 96:6-10. Plaintiff put the train into emergency, but he was struck by the truck's mirror, and the impact caused him to fall to the ground. *Id.* at 91:16-20, 102:16-22.

This evidence establishes the negligence of UP through the conduct of Richter, Plaintiff's trainer. Indeed, UP's expert witness who is designated to provide opinions concerning switching operations, Jerry Ochoa, provides testimony concerning Richter's responsibilities to observe the track and instruct Plaintiff about the correct steps to take, and correct him if necessary. Ex. 10 at 40:4-18, 41:14-19, 43:5-7, 44:19-22. Ochoa also begrudgingly agreed that Richter should have stopped the movement at his discovery deposition:

> Q.      Can we agree that if Mr. Richter saw a vehicle beginning to back that may foul the track, that Mr. Richter would be responsible for telling Mr. Fuentes to stop the movement?
>
> A.      He could advise Mr. Fuentes, yes.
>
> Q.      Would he not be obligated to do that under the rules for maintaining a safe course?
>
> A.      Yes, sir, but again, I don't know what he did or did not tell Mr. Fuentes, so I can't answer that.

Ex. 10 at 49:16-50:1.

UP's other expert, Noel Manual, was more candid with respect to Richter's conduct, and testified at his discovery deposition that in his review of the materials to determine stopping distances of the train once the train was seen, there was no indication that Richter told Plaintiff to stop or put the train into emergency before the collision. Ex. 11 at 34:14-19, 35:8-1, 35:23-36:3, 36:4-8.

The undisputed acts of Richter or Pirnie or both can lead to one conclusion – one or both were negligent and therefore, by imposition of vicarious liability UP is negligent as a matter of law.

A similar conclusion was reached in *Cullinan v. Burlington Northern, Inc.*, 522 F.2d 1034 (9th Cir. 1975), where the plaintiff was injured while attempting to place a derailed railcar back on a track. The plaintiff was thrown off the car as he attempted to attach a crane's cable to the

derailed car. *Id.* at 1035. The trial court granted the plaintiff's motion for a direct verdict on the issue of negligence because it determined that the uncontradicted evidence presented at trial established that the railroad was negligent. *Id.* at 1036. In affirming the trial court, the Ninth Circuit noted that directed verdicts were appropriate in only exceptional cases.[6] *Id.* Nevertheless, the court determined the directed verdict was warranted because the "uncontradicted evidence that the supervising employees created a dangerous condition by rolling the cars into contact and by failing to take steps to protect plaintiff when he was ordered to perform work on top of the canted gondola." *Id.*

In another case, *Knierim v. Erie Lackawanna RR Co.*, 424 F.2d 745 (2nd Cir. 1970), a railroad was found to be negligent as a matter of law. In this case, the plaintiff was injured when the train he was riding on was struck by another train. *Id.* at 746. The trial court directed a verdict against the railroad on the issue of negligence and contributory negligence. *Id.* The Second Circuit affirmed by reasoning that under the two different scenarios, the defendant was negligent as a matter of law: "In either event the Railroad was negligent as a matter of law. No alternative cause not involving negligence on the part of the Railroad has been suggested and indeed it is almost inconceivable that one could exist." *Id.* at 747.

The lesson to be learned from *Cullinan* and *Knierim* is that a trial court may direct a verdict on the issue of a railroad's negligence in FELA cases where the evidence supports only one reasonable conclusion. Here, the only reasonable inference that the evidence supports is that UP breached his duty based on the conduct of Richter and Pirnie.

---

[6] The fact that the issue in *Cullinan* was whether the trial court properly granted a motion for directed verdict on the issue of negligence and the issue in the pending case is whether this Court may grant Plaintiff's summary judgment makes no difference since the standards for the two motions are the same. *Porous Media Corp. v. Paill Corp.*, 186 F.3d 1077, 1081 (8th Cir 1999) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

Finding a defendant negligent as a matter of law is consistent with well-established legal commentary. The function of a trial court in a negligence action is succinctly set out in the Restatement (Second) of Torts:

In an action for negligence the court determines

(a) whether the evidence as to the facts makes an issue upon which the jury may reasonably find the existence or non-existence of such facts;

(b) whether such facts give rise to any legal duty on the part of the defendant;

(c) the standard of conduct required of the defendant by his legal duty;

(d) whether the defendant has conformed to that standard, in any case in which the jury may not reasonably come to a different conclusion;

(e) the applicability of any rules of law determining whether the defendant's conduct is a legal cause of harm to the plaintiff; and

(f) whether the harm claimed to be suffered by the plaintiff is legally compensable.

Restatement (Second) of Torts § 328 B (1965). Thus, the Restatement contemplates situations where the evidence supports only one reasonable conclusion as is the circumstance in the pending case.

The comment to Section 328 B provides further direction to court's when faced with a situation where the evidence establishes only one reasonable conclusion or inference:

Normally the determination of the question whether the defendant has conformed to the standard of conduct required of him by the law is for the jury. Although it involves an application of the legal standard, and to considerable extent a decision as to its content and meaning …, it is customarily regarded as a question of fact. *As in the case of other questions of fact, however …, the court reserves a power of determination of the preliminary question whether the evidence will permit the jury reasonably to come to more than one conclusion. Where it is clear upon the evidence that the defendant has or has not conformed to what the standard of the law requires, and that no reasonable man could reach a contrary conclusion, the*

*court must withdraw the issue from the jury and direct a verdict, or give binding*
*instructions if there are still other issues in the case.*

*Id.* at § 328 B cmt. g (emphasis added).

Here, the evidence only supports one conclusion that UP was negligent, which makes
granting summary judgment proper.

### 3. The negligent acts of UP's employee and agent caused the incident as a matter of law.

FELA's causation standard is a relaxed standard compared to the common law and is based
on the Act's statutory language stating a railroad is liable "for . . . injury or death resulting in whole
or in part from the negligence of any of the officers, agents, or employees of such carrier . . .." 45
U.S.C. § 51. Based on the statutory language, the U.S. Supreme Court held that a jury is properly
instructed in a FELA case when it is charged: "a defendant railroad 'caused or contributed to' a
railroad worker's injury 'if [the railroad's] negligence played a part – no matter how small – in
bringing about the injury.'" *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 705 (2011). The U.S.
Supreme Court describes "the FELA's language on causation . . . is as broad as could be framed."
*Id.* at 691 (citation omitted).

The evidence establishes that Richter's and Pirnie's negligent acts caused in whole or in
part the October 4, 2018 incident as a matter of law. The testimony of UP's expert witness, Noel
Manual, establishes Richter's failure to order Plaintiff to stop the train movement caused the
collision. Manual calculated that the collision would have been avoided had Richter told Plaintiff
to stop when the truck made its forward movement, Ex. 11 at 33:23-34:12; when the truck stopped
before backing up, *Id.* at 34:20-35:6; or when the truck engaged its reverse lights indicating it was
backing up, *Id.* at 35:14-22. As discussed above, as Plaintiff's trainer, Richter was required to
keep a proper lookout for equipment fouling the track and instruct Plaintiff on what to do, but he

failed this task miserably. Instead of ordering Plaintiff to stop the movement when Plaintiff asked Richter specifically what to do about the truck, he directed Plaintiff to sound the locomotive's whistle and horn. When Richter finally saw the truck, he yelled an expletive, but it was too late and the truck hit Plaintiff.

With respect to Pirnie's negligent conduct causing the incident, as previously discussed, Pirnie was required to follow UP's specific rules concerning backing vehicles. The back-up rule was put into place "to help protect the safety of both UP employees and contractors that work for [UP]" as testified to by UP's Rule 30(b)(6) witness, Brain Jarrett who was produced to testify about rules that contractors must follow while on UP property. Ex. 6 at 29:11-30:4; Ex. 7. This evidence establishes causation as a matter of law because there the only reasonable conclusion that may be reached is that Pirnie's conduct contributed to the incident.

Last, any alleged culpable conduct by Plaintiff does not create a fact question on the issue of causation since an employee's fault does not bar recovery, but only reduces recovery by the employee's percentage of fault. 45 U.S.C. § 53; *see also Burlington N. Inc. v. Hughes Brothers, Inc.*, 671 F.2d 279, 283 (8th Cir. 1982) (noting "[i]n an FELA case, the jury may diminish an employee's recovery 'in proportion' to the amount of negligence attributable to such employee"). In other words, a plaintiff's negligent conduct may combine with a railroad's negligent conduct to cause an incident, but the railroad's fault is still a contributory factor. *See McCarthy v. Pennsylvania R.R. Co.*, 156 F.2d 877, 881 (7th Cir. 1946) (holding that the employee's conduct in operating a train was not a sole cause of the incident when such conduct was a concurring act that combined with the railroad's culpable conduct to cause the incident) (citing *Spokane & Inland Empire R.R. Co. v. Campbell*, 241 U.S. 497, 512 (1916)). The only issue created by evidence of a plaintiff's fault is a question of apportioning fault between a plaintiff and defendant, but as

discussed in the next section, UP cannot meet its burden of proof to establish its contributory negligence defense.

### a. UP cannot not dispute that its negligence caused some injury.

On the question related to whether the October 4, 2018 incident causing an injury to Plaintiff, UP does not dispute this issue. Based on UP's admission Response to Plaintiff's Requests for Admissions Numbers 17 through 22, the railroad admits that the medical treatment received by Plaintiff at Great Plains Regional Medical Center emergency room, treatment received at Denver Health, treatment received at Briarwoods Health Care Center, treatment received from Dr. Steven Sands, and surgeries performed on October 5, 2018, October 29, 2019, February 6, 2019 and October 2, 2019, were reasonably necessary and causally related to the October 4, 2018 incident. Ex. 3 at 1-3. While the issues related to the nature and extend of the injury and resulting damages are for a jury to determine, the UP admits that some injury occurred requiring entry of summary judgment on the issue of causation. *See Ainsworth v. Rapid City, Pierre & E. R.R., Inc.,* 447 F.Supp.3d 953, 964 (D. S.D. 2020).

### 4. UP cannot meet its burden of proof establishing its contributory negligence defense.

UP bears the burden of establishing its contributory negligence defense. *Borough v. Duluth, Missabe & Iron Range Ry. Co.,* 762 F.2d 66, 69 (8th Cir. 1985) (citation omitted). The issue of a plaintiff's negligence is only appropriate where there is evidence that he or she failed to exercise reasonable care. *Wilson v. Burlington N., Inc.,* 670 F.2d 780, 782 (8th Cir. 1982).

Determining whether there is evidence supporting a contributory negligence defense is somewhat tricky because assumption of the risk is not a defense under the FELA. 45 U.S.C. § 54. Indeed, "[a]lthough there is some overlap between assumption of risk and contributory negligence, generally the two defenses are not interchangeable". *Taylor v. Burlington N. R.R. Co.,* 787 F.2d

1309, 1316 (9th Cir. 1986). Accordingly, a trial court must scrutinize the evidence offered by a defendant in support of its defense to make sure assumption of the risk does not enter a case. *See, Tiller v. Atlantic Coast Line R.R. Co.*, 318 U.S. 54, 66-67 (1943) (noting "assumption of risk, must not, contrary to the will of Congress, be allowed recrudescence under any other label in the common law lexicon").

Contributory negligence is defined as "a careless act or omission on the plaintiff's part tending to add new dangers to conditions that the employer negligently created or permitted to exist." *Taylor*, 787 F.2d at 1316 (citation omitted). Assumption of the risk is defined as "an employee's voluntary, knowledgeable acceptance of a dangerous condition that is necessary for him to perform his duties ...." *Id.* Examples of assumption of the risk is an "employee who enters the workplace for a routine assignment in compliance with the orders and directions of his employer or its, supervising agents, who by such entry incurs risks not extraordinary in scope ...." *Id.* Additionally, evidence that an employee refused to perform his or her assigned work does not support a contributory negligence defense. *See Fashauer v. New Jersey Transit Rail Operations, Inc.*, 57 F.3d 1269, 1278 (3rd Cir. 1995) (noting the alternative of an employee quitting rather than performing an assigned job is not evidence of contributory negligence).

There is no evidence which raises a jury question related to UP's contributory negligence defense since Plaintiff was under the direct supervision of Richter, his trainer. Richter knew at the beginning of the shift that Plaintiff's experience using RCL boxes to make switching moves was limited as demonstrated by his questioning about the jargon used during the safety briefing in the yardmaster's office. Ex. 2 at 80:19-81:4. The record is devoid of any evidence that Plaintiff ever failed to follow any directive of Richter, a supervising UP employee.

As discussed above, it was Richter's responsibility to oversee Plaintiff's work to make sure he complied with UP's rules and procedures. Ex. 10 at 41:14-19. Plaintiff followed Richter's instruction that included controlling the speed of the movement. Ex. 2 at 91:4-10. Plaintiff followed Richter's instruction when he asked him: "'hey, man, what about that truck?' And [Richter] said 'go ahead and sound your horn and bell.'" *Id.* at 91:11-13. Plaintiff complied with this instruction by looking down at the RLC box to sound the horn and bell, and at this point, he heard what was most likely Richter's expletive triggered by the approaching fuel truck. *Id.* at 91:13-14. This evidence, if probative of anything, only establishes a defense of assumption of risk – a defense barred by the FELA. 45 U.S.C. §54.

A similar result was reached in *Wilson*, a case where the plaintiff was injured when he was asked to help three co-workers position a heavy pan underneath a railcar. 670 F.2d at 781. The district court submitted the issue of contributory negligence to the jury, and the jury returned a verdict for the railroad. *Id.* at 782. The plaintiff argued on appeal the district court erred when it instructed the jury on the contributory negligence issue. *Id.* The Eighth Circuit began its analysis by noting a railroad "is entitled to a contributory negligence instruction if there is any evidence to support that theory." *Id.* And the question to be answered is whether there is evidence "presented from which a jury could properly find a lack of due care by a plaintiff ...." *Id.* But then the analysis continued where the nature of the evidence presented by the railroad was examined, and whether it was legally sufficient to create a fact issue for the jury.

The evidence evaluated by the Eighth Circuit included a jack being available to assist in placing the pan under the car, and additional help being available to plaintiff if he thought the job was too dangerous. *Id.* at 782-783. Based upon this evidence, the railroad argued the issue of contributory negligence was sufficiently supported because it was the plaintiff's choice to lift the

pan without safer equipment or without additional help. *Id.* at 783. The Eighth Circuit rejected the railroad's argument because the method used by the plaintiff (i.e., placing the pan on the car by hand rather than with the use of a jack) was the procedure used by the railroad at the time. *Id.* Thus, he was merely following orders just like Plaintiff did when he followed Richter's instructions.

The court also made the following astute observation with respect to a subordinate employee refusing to perform a job once they are asked:

> The railroad's argument simply is not consistent with the realities of the workplace. Wilson was asked to help carry the pan. As was the custom at the Burlington Northern, he complied with the request. When a man's assistance is needed and asked for, he helps – there is no choice involved.

*Id.*

Because the railroad failed to offer any independent evidence of the plaintiff's failure to exercise reasonable care, the Eight Circuit held the district court committed reversible error when it submitted the issue of contributory negligence to the jury. *Id.*

A similar result was reached in *Benson v. CSX Transp., Inc.*, 274 Fed.Appx 273 (4th Cir. 2008), a case where the plaintiff exited a train that included a railcar leaking hydrochloric acid. *Id.* at 274. The plaintiff reported the leak to a supervisor, and eventually reboarded the train to move it. *Id.* at 275.

The railroad argued that the issue of the plaintiff's fault should be submitted to the jury because he voluntarily reboarded the train. *Id.* at 276. The plaintiff argued there was insufficient evidence creating a jury question based on trial testimony that he reboarded the train based on a supervisor's order, which was an order coming from another yardmaster. *Id.* The railroad supervisor who the plaintiff contended ordered him back onto the train did not testify at trial. *Id.* The Fourth Circuit affirmed the district refusing to submit the railroad's defense and granting the

plaintiff's motion for judgment as a matter of law because the railroad failed to offer evidence that contradicted the plaintiff's testimony that he boarded the train based upon the direct order of his supervisor. *Id.*

The lesson to be learned from *Wilson* and *Benson* is that a railroad asserting a contributory negligence defense has the burden to offer evidence that does more than question the plaintiff's testimony; but instead, must offer affirmative evidence supporting its defense. *See also Birchem v. Burlington Northern R.R. Co.*, 812 F.2d 1047, 1048-49 n. 3 (8th Cir. 1987) (rejecting the railroad's argument "stress[ing] inconsistencies in [the plaintiff's testimony] by using numerous impeachment witnesses"). Indeed, "a [railroad] cannot rely solely on the credibility of the plaintiff's testimony to establish contributory negligence." *Id.* at 1049 n. 4 (citing *Borough*, 762 F.2d at 69).

The undisputed evidence shows that Plaintiff's conduct was limited to complying with the instructions of his supervising employee, Richter – an act which does not provide the basis for a comparative negligence. Absent other evidence, summary judgment on the comparative fault of the Plaintiff must be granted.

## V.    Conclusion

The undisputed evidence in this case establishes that UP's employee (Richter) or agent (Pirnie) or both were negligent as a matter of law. Under either scenario concerning who failed to exercise reasonable care, UP is liable since it is legally responsible for the negligent acts of its employees and agents. The undisputed evidence also establishes that the negligent acts caused in whole or in part the October 4, 2018 incident, and further that Plaintiff suffered an injury. UP cannot establish a jury question on comparative fault since the undisputed evidence establishes Plaintiff complied with the instructions of his trainer. Accordingly, Plaintiff respectfully asks the

Court to grant his motion for partial summary judgment on liability, causation and comparative negligence.

Dated this 29th day of June, 2021.

HUNEGS, LeNEAVE & KVAS, P.A.


s/William Kvas
William Kvas, #24930
Jayson D. Nelson, #2211-Omaha Office
1000 Twelve Oaks Center Drive, Suite 101
Wayzata, MN 55391
Tel: (612) 339-4511
Fax: (612) 339-5150
wkvas@hlklaw.com
jnelson@hlklaw.com

ATTORNEYS FOR PLAINTIFF

CERTIFICATE OF COMPLIANCE


I certify that this brief complies with the word limits and other requirements of NECivR 7.1(d). I have relied upon the word count function of Microsoft Word 365 software, which was applied to all text including the caption, headings, footnotes, and quotations, which calculates the current word count at 10,751words.


s/William Kvas

CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2021, I electronically filed the foregoing document with the Court using the CM/ECF system which sent notification of such filing to the following:

Kristina J. Kamler (kkamler@ekoklaw.com)
Stephen G. Olson, II (solson@ekoklaw.com)
ENGLES, KETCHAM, OLSON & KEITH, PC
1350 Woodmen Tower
1700 Farnam Street
Omaha, NE 68102

Kyle Wallor  (kwallor@ldmlaw.com)
LAMSON, DUGAN and MURRAY
10306 Regency Parkway Drive
Omaha, NE  68114


s/William Kvas